| | |
|---|---|
| **Hearing Date:** | **August 2, 2016 at 10:00 a.m. (ET)** |
| **Objection Deadline:** | **July 26, 2016 by 5:00 p.m. (ET)** |

HAHN & HESSEN LLP
Mark T. Power, Esq.
488 Madison Avenue
New York, NY 10022
(212) 478-7200
(212) 478-7400

*Attorneys for GoldStar Trust Company*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

In re:                                                    :

                                                          :          Chapter 11

Heavenly Vision Christian Center Inc.,                    :          Case No. 15-13035 (SCC)

                                                          :

                                Debtor.                   :

------------------------------------------------------------------- x

**MOTION OF GOLDSTAR TRUST COMPANY FOR AN ORDER (A)
DISMISSING CHAPTER 11 CASE FOR CAUSE PURSUANT TO 11
U.S.C. § 1112(B) OR (B) IN THE ALTERNATIVE, GRANTING RELIEF
FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

Happy State Bank, d/b/a GoldStar Trust Company, as Trustee for the benefit

of the Bondholders of Heavenly Vision Christian Center, Inc. ("GoldStar"), by and through

its undersigned counsel, Hahn & Hessen LLP, hereby submits this motion (the "Motion")

for an order (A) dismissing this chapter 11 case for cause pursuant to section 1112(b) of title

11 of the United States Code (the "Bankruptcy Code") or (B) in the alternative, modifying

the automatic stay pursuant to section 362(d) of the Bankruptcy Code, Rule 4001 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-1 and

9013-1 of the Local Rules for the United States Bankruptcy Court for the Southern District

of New York (the "Local Rules"), to permit GoldStar to enforce its rights against its collateral.  In support of the Motion, GoldStar submits the accompanying Declaration of Wanda Perdue dated July 12, 2016 (the "Supporting Declaration"), annexed hereto as Exhibit 1, and respectfully states as follows:

### PRELIMINARY STATEMENT

1.    As detailed in the Supporting Declaration, after Heavenly Vision Christian Center, Inc. (the "Debtor") first defaulted in 2008 on its monthly mortgage loan payments to GoldStar, on behalf of the Debtor's Bondholders, and then repeatedly breached between 2008 and 2011 its payment obligations under the forbearance and other agreements entered into with GoldStar, the Debtor stopped making mortgage payments altogether starting in October 2011.  Consequently, GoldStar commenced a foreclosure action on January 30, 2012.  After an inordinate delay necessitating the filing of a writ of mandamus, the New York Supreme Court, County of Bronx, entered a judgment of foreclosure and sale on July 17, 2015, granting GoldStar a judgment against the Debtor in the amount of $2,450,496.35, plus interest, costs and expenses and authorizing a foreclosure sale against the Properties (defined below).  The current balance owed to the Bondholders has now ballooned to over $3 million.

2.    On November 13, 2015, three days prior to the scheduled foreclosure sale of the Properties, the Debtor filed its petition in bankruptcy for the admittedly sole purpose of staying the foreclosure sale.  Despite the inordinate five-year delay, GoldStar refrained from immediately filing this Motion, mindful of this Court's observation at the initial case conference that it was inclined to give the Debtor a reasonable period of time to see if it could come up with a solution and propose a viable plan of reorganization.

2

3.      More than seven months have now passed and the Debtor has made no progress towards filing a viable chapter 11 plan, nor has it accepted (or even responded in any meaningful way) to GoldStar's proposed consensual plan term sheet.  Having been given more than ample time to come up  with a viable alternative, the time has come for the Court to either dismiss this chapter 11 case or grant GoldStar relief from the automatic stay so that it can exercise its long-delayed rights against its collateral.  Dismissal is appropriate here because this case squarely meets the criteria for a bad faith filing, including that there are no meaningful creditors in this case other than GoldStar which need protection and the sole purpose for the chapter 11 filing was to prevent GoldStar from exercising its legal, legitimate, and contractual rights as a secured creditor.  Further, there is no reasonable prospect for the Debtor to be able to propose and confirm a viable chapter 11 plan in this case given its demonstrated inability to generate sufficient income for more than five years to be able to adequately service its debt.  Alternatively, relief from stay is appropriate because the Debtor lacks meaningful equity in the Properties, and the Properties are unnecessary to an effective reorganization of the Debtor.  Moreover, cause exists for granting relief from stay, because interest and expenses continue to accrue on GoldStar's debt, despite the minimal adequate protection payments being made, further eroding any marginal equity cushion that may remain in the Properties, and as noted, the case was filed in bad faith.

## BACKGROUND

### A.  *The Parties*

4.      GoldStar is a banking association with trust powers, duly organized and operating under the laws of the State of Texas with a principal office location in Canyon, Texas.

5.      The Debtor is a not-for-profit corporation duly organized and operating under the laws of the State of New York with its principal place of operations located in Bronx County, New York.

6.      On November 13, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), thereby staying the scheduled foreclosure Sale of the Properties noticed three days later for November 16, 2015.

7.      The Debtors' List of Creditors [*See Doc No. 10*] shows that besides GoldStar, the Debtor has less than 20 non-insider pre-petition creditors, mostly ordinary trade vendors owed nominal amounts for a single month's services such Time Warner Cable, Oxford Health Plan, Geico and Con Edison.  Besides GoldStar, total non-insider claims aggregate less than $64,000, or an average of less than 30-days of the Debtor's typical accounts payable.

### B.  *The Mortgage Bonds and the Pre-Petition Defaults*

8.      On or about February 9, 2007, the Debtor issued first mortgage bonds (the "Bonds") pursuant to a Trust Indenture (as amended) (the "Trust Indenture") in the

4

principal sum of Two Million One Hundred Thousand and No/100 Dollars ($2,100,000.00). *See Supporting Declaration at ¶ 4.*

9.      On or about July 10, 2007, the Debtor executed and delivered to Church Loans & Investments Trust ("CL&IT") an interim note in the amount of One Million Six Hundred Twenty Thousand One Hundred Forty Five and No/100 Dollars ($1,620,145.00) (the "Note"). *Id. at ¶ 6.*

10.      The Trust Indenture and Note were secured by a first mortgage dated July 10, 2007 in the principal amount of Two Million One Hundred Thousand and No/100 Dollars ($2,100,000.00) (the "Mortgage"). *Id. at ¶ 7.*

11.      By assignment of mortgage dated January 22, 2008, CL&IT assigned all of its right, title and interest in and to the Note and Mortgage to the GoldStar. GoldStar became trustee of the Trust Indenture, as well as the owner and holder of the Note. *Id. at ¶ 9.*

12.      GoldStar is not an institutional mortgagee in the traditional sense, but is the trustee for the benefit of likely dozens of individual bondholders who have, in many instances, invested the proceeds from their savings and retirement funds to purchase the Bonds issued by the Debtor with the expectation that they would receive regular interest payments from Debtor. Further, GoldStar is merely the trustee, paying agent and registrar for the bond program under which the Bonds were issued. The Bonds were issued by the Debtor and sold under a brokerage arrangement with Great Nation Investment Corporation and only after the decision by the Debtor to issue the Bonds, did GoldStar agree to serve as trustee for the benefit of the Debtor's bondholders. *Id. at ¶ 5.*

13.    As set forth in detail in the *Supporting Declaration* ¶ *10-11*, on or around July 29, 2008, Debtor defaulted on the Bonds and thereafter GoldStar issued a default notice and subsequently accelerated the debt.  Between 2008 and 2011, GoldStar attempted to work with the Debtor by negotiating a series of agreements whereby GoldStar would agree to either rescind the acceleration and reinstate the payment terms of the Trust Indenture or forbear from exercising its rights as a secured creditor under the Trust Indenture based on a new payment plan, only to see the Debtor repeatedly default a short while later on its payment obligations, each time with the balance owed on the Bonds increasing.

14.    On or around October 20, 2011, Debtor made a partial payment of $31,000.00.  GoldStar notified the Debtor that its total amount past due was $158,923.58 and that it would owe this amount, plus attorneys' fees and expenses, by November 21, 2011 lest it accelerate the debt and foreclose on the Properties.  The October 20, 2011 payment was the last prepetition payment that GoldStar received.  Consequently, GoldStar commenced a foreclosure action on January 30, 2012 by filing a summons and complaint with the New York Supreme Court, County of Bronx.  On June 17, 2013, the Supreme Court granted judgment and related relief in favor of GoldStar against the Debtor.

15.    On July 17, 2015, after GoldStar had been forced to file for a writ of mandamus due to the delay, the Supreme Court (Honorable Norma Ruiz) ordered the foreclosure and sale of the Properties to satisfy Debtor's default and remaining debt in the judgment amount of $2,450,496.35, plus accrued interest, fees and costs.  The judgment sale of the Properties was noticed for November 16, 2015, but it was stayed due to the Debtor's chapter 11 filing three days earlier on November 13, 2015.  *Id. at* ¶ *12.*

6

16.    The amount owed on the Bonds has skyrocketed to nearly $3.0 million as of the Petition Date due to the Debtor's failure to make a single payment on the bonds for over five years.[1]  Interest at the New York State annual judgment rate of 9%, plus fees, costs and expenses, continue to accrue on the Bonds at a rate of approximately $25,000-$30,000 per month, significantly more than the $15,000 in monthly adequate protection payments ordered by the Bankruptcy Court.  *Id. at ¶ 17.*

C.    *The Properties*

17.    The Bonds are secured by the first Mortgage on the land and improvements of two of the Debtor's properties:  (A) 2868 Jerome Avenue, Borough of the Bronx, New York ("Bronx Property"), and (B) 3879 Route 405, Westerlo, New York ("Westerlo Property") (the Bronx Property and Westerlo Property herein collectively described as the "Properties").  *Id. at ¶ 8.*

18.    The Bronx Property is the Debtor's principal place of operations for the church, comprised of a single story commercial building built in 1952.  In 2014, Goldstar commissioned an appraisal of the Bronx Property, which estimates that the "As Is Market Value", based on a 12-to-18 month marketing period and before deducting sales-related expenses, is $1,200,000.  *See Supporting Declaration at ¶ 13, Exh. B for a copy of the July 30, 2014 Appraisal of the Bronx Property.*

19.    The Westerlo Property is periodically used as a seasonal retreat center, comprised of approximately 75 acres located in a mountainous region in Albany County, with multiple buildings serving as a recreation center, guest cottages, a small chapel and

---

[1]    On April 15, 2016, GoldStar timely filed a proof of claim with the Bankruptcy Court asserting that Debtor is indebted to GoldStar as of the Petition Date for approximately $2,939,319.90, which includes the principal, pre-petition interest, and certain pre-petition costs and fees.  Post-petition interest, costs and fees continue to accrue ("GoldStar's Secured Claim").

related-storage facility.    The Property has outdoor recreational facilities, including a tennis court, in-ground swimming pool, and outdoor basketball court.    In 2014, Goldstar also obtained an appraisal of the Westerlo Property, which estimates that the "As Is Market Value", based on a 12-to-24 month marketing period and before deducting sales-related expenses, is $2,400,000.  *See Supporting Declaration at ¶ 14, Exh. C for a copy of the July 30, 2014 Appraisal of the Westerlo Property.*

20.    Because of its general lack of use and the Debtor's limited financial resources, GoldStar has serious concerns with the prospect of significant deferred maintenance and upkeep at the Westerlo Property.  *Id. ¶ 15.*

**D.    *Debtor's Pre- and Post-Petition Financial Performance***

21.    Prior to the Petition Date, the Debtor experienced significant operating losses year-after-year, notwithstanding the fact that the payment obligations owed under the Bonds were ignored, but continued to accrue.  According to the Debtor's own financials, for the years of 2012, 2013, and 2014, the Debtor experienced net operating losses of ($73,127), ($95,796), and ($105,522), respectively, not including any accrued but unpaid mortgage payments due on the Bonds.  *See Yearly Financial Reports, Supporting Declaration at ¶ 18, Exh. Nos. D, E and F.*

22.    A review of the Debtor's Yearly Financial Reports reveals that maintaining the Westerlo Property has been the largest contributor to the Debtor's annual operating losses.  Specifically, a comparison of the income versus expenses attributable to the Westerlo Property, on a cash flow basis before taking into account unpaid mortgage expense, depreciation, etc., shows that approximately fifty percent (50%) of the Debtor's net operating losses each year was attributable to the Debtor's maintaining the Westerlo

8

Property.   For the years of 2012, 2013, and 2014, the portion of the operating losses attributable to maintaining the Westerlo Property were ($39,738) (54.3%), ($49,175) (51.3%), and ($44,845)( 42.5%), respectively.   *Id. at ¶ 19, Exh. No. G.*[2]

### E.    *Post-Petition Activities and Plan Negotiations*

23.    Although the Debtor appears to have been able post-petition to achieve a modest reduction in its payroll and other expenses during the first four months of the case (November 2015 – February 2015) and as a result, realize modest aggregate net income of during the four months of approximately $33,000, this is without taking into account the $15,000 in monthly adequate protection payments the Bankruptcy Court ordered be paid to GoldStar commencing April 2016 or the cost and fees associated with this  bankruptcy case. Had the adequate protection payments been taken into account for the first four months, the Debtors would have realized a net operating loss on a cash basis of more than ($20,000) in the first four months.   These losses would have been even greater had the Debtor been required to service  properly  the  entire  defaulted  amount  due  under  the  Bonds (approximately $25,000 per month).  *Id. at ¶20.*

24.    While not accounted for separately on the Debtor's monthly operating reports, upon information and belief, the Debtor continues to incur significant losses post-petition maintaining the Westerlo Property. *Id. at ¶21.*

25.    In addition to the Properties, the Debtor owns two vacant parcels of unencumbered real property located on Sedgwick Avenue, in the Bronx, New York (the "Sedgwick Property").  Despite the Debtor estimating in its Schedules that the current value of the vacant Sedgwick Property is $2,000,000, to date the Debtor has failed to produce any

---

[2]    The Westerlo Property is referred to by the Debtor as "Prayer Mountain" in its financial statements.

credible buyer willing to pay even half that amount. Nevertheless, the Debtor has premised

its entire reorganization prospects around the single concept that it can sell the Sedgwick

Property, use the proceeds to reduce GoldStar's secured claim, and negotiate a restructured

mortgage for the remaining debt with GoldStar and avoid having to sell either of the

Properties. The Debtor's approach is not feasible and is unworkable for several reasons.

First, the Debtor has been unable to sell the Sedgwick Property for a sufficient price to be

able to apply the net proceeds towards GoldStar's Secured Claim and cure the defaults.

Further, absent a sale of at least one of the remaining two Properties, the remaining balance

owed on the Mortgage will be simply too high to satisfy the requisite loan-to-value ratio and

the Debtor will be unable to service the Mortgage without a high risk of subsequent defaults,

particularly in light of the Debtor's marginal and highly erratic monthly net operating

income from tithes and offerings. *Id. at ¶22.*

26.    As an alternative, GoldStar proposed to the Debtors that in addition to

selling the Sedgwick Property, it also agree to sell the Westerlo Property in a commercially

reasonable manner over a reasonable period of time, and apply the proceeds from both sales

to reduce the balance of the mortgage debt. The balance of the secured debt would continue

to be secured by the existing mortgage against the Bronx Property, but reduced to a

manageable number, which the Debtor should then be in a position to make the monthly

mortgage payments on and eventually refinance in a 3-to-5 year period. Under GoldStar's

proposal, the Debtor's risk of future operating losses would be reduced significantly since it

would no longer have to carry the financial burden of maintaining the Westerlo Property

and its congregation would be able to continue to utilize the Bronx Property for religious

activities, without the continuing threat of foreclosure. To date, the Debtor has neither

10

accepted nor even responded in any meaningful way to GoldStar's plan proposal.

Accordingly, GoldStar has no choice by the file this Motion.

## RELIEF REQUESTED

27.    GoldStar seeks the dismissal of this bankruptcy case for cause pursuant

to Bankruptcy Code §1112(b), or in the alternative, for relief from stay pursuant Bankruptcy

Code § 362(d).

28.    The Court has jurisdiction over this proceeding under 28 U.S.C. §

1334.

## ARGUMENT

*A.    The Court Should Dismiss this Chapter 11 Case for Cause.*

29.    "The ultimate goal of business reorganization under chapter 11 of the

Bankruptcy Code is the judicial confirmation of a reorganization plan that enables the

debtor to restructure its pre-bankruptcy debts, pay its creditors, and return to active

operation as a viable enterprise, free from judicial control and creditor scrutiny." *In re Great*

*American Pyramid Joint Venture,* 144 B.R. 780, 788 (Bankr. W.D. Tenn. 1992) (*citing* H.R.

Rep. No. 595, 95th Cong., 1st Sess. 220 (1977)); *See also Stage 1 Land Co. vs. U.S.*,71 B.R.

225, 231 (D. Minn 1986) ("The stated purpose of Chapter 11 of the Bankruptcy Code is the

rehabilitation of a viable business.   Absent a reasonable possibility of an effective

reorganization, a case should be dismissed at its outset for cause.").

30.    However, "all troubled businesses cannot be rehabilitated or

successfully reorganized under chapter 11, which chapter is clearly not a panacea for all

problems. *Cf.* 11 U.S.C. § 1112(b). The section 362(a) automatic stay and the accompanying

breathing spell do not last forever. *See section 362(c) and (d).* Every case should move to a

conclusion at the earliest time and with the least expense which are consistent with the interest of justice." *Id.*

31.    It is in this context where the requirement that a debtor must file its bankruptcy case in good faith arises. "A good faith requirement prevents abuse to the bankruptcy process by debtors whose overriding motive is to delay creditors without benefiting them in any way or to achieve reprehensible purposes." *Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) (*quoting In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)) (internal quotation marks omitted); *see also C-TC 9th Ave. Pshp. v. Norton Co. (In re C-TC 9th Ave. Pshp.),* 113 F.3d 1304, 1311 (2d Cir. 1997) (affirming dismissal of a chapter 11 as a bad faith filing where it was filed to avoid the consequences of an adverse state court decision and there was no realistic prospect of a reorganization as a result of the "state litigation [taking] a turn adverse to [the debtor], make mortgage foreclosure imminent").

32.    Section 1112(b) of the Bankruptcy Code provides that a court shall dismiss a chapter 11 case if the movant establishes "cause." 11 U.S.C. § 1112(b).   "In all three chapters, the concept of 'cause' has been interpreted to include a lack of good faith in filing the bankruptcy petition or, as other courts prefer to describe it, a failure to present a bankruptcy case implicating any of the policies underlying the chapter in which the debtor seeks protection." *In re Am. Telecom Corp.*, 304 B.R. 867, 869 (Bankr. N.D. Ill. 2004) (internal citations omitted).

33.    Section 1112(b) of the Bankruptcy Code provides a non-exclusive list of examples of "cause." While instructive, the list set forth in Section 1112(b) of the Bankruptcy Code is non-exhaustive, and whether "cause" exists is a matter of judicial discretion based upon the facts and circumstances of each particular case. H.R.Rep. No. 95-

595, at 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6392 ("[The] list [contained in §

1112(b)] is not exhaustive. The court will be able to consider other factors as they may arise,

and to use its equitable powers to reach an appropriate result in individual cases.").

34.    Courts in cases similar to this case have examined a number of factors

in determining when a debtor files a petition in bad faith. These factors include:

a.    lack of a reasonable probability of an effective reorganization;

b.    the debtor has only one asset;

c.    the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

d.    the debtor's one asset is the subject of a foreclosure action as a result of arrearages or defaults on the debt;

e.    the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors, which can be resolved in the pending state court foreclosure action;

f.    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

g.    the debtor has little or no cash flow;

h.    the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and

i.    the debtor has a limited number or no employees.

*See, e.g., C-TC 9th Ave. Pshp,* 113 F.3d at 1311;  *See also In re Pleasant E. Assocs.,* 286 B.R. 509

(Bankr. S.D.N.Y. 2002) (applying similar factors):    *In re Ophir Trust*, 112 B.R. 956 (E.D.

Wis. 1990) (same), *In re Castleton Assoc. Ltd. P'ship*, 109 B.R. 347 (S.D. Ind. 1989) (same).

35.    In this case, the Debtor's petition meets nearly every one of the badges

of bad faith listed above.   Accordingly, Debtor cannot carry its burden to demonstrate that

its petition was filed in good faith.

36.     First, there is no realistic prospect that the Debtor can successful reorganize, without GoldStar's consent.  As discussed above, the Debtor's marginal and highly erratic monthly net operating income is insufficient to be able to demonstrate an ability to service the GoldStar mortgage debt without a high risk of another default occurring in the near future.  And the Debtor is otherwise unable to meet the standards for confirming a nonconsensual plan under Bankruptcy Code §§ 1122-29. There is not simply enough projected cash flow to make the required monthly payments on the Bonds, let alone to cure the nearly $1 million in defaulted payments that the Debtor owes to GoldStar. Plainly put, the Debtor has no ability to reorganize.

37.     Although the Debtor has three pieces of real property, two constitute collateral for the Goldstar's Secured Claim, and the Sedgwick Property is a vacant lot.  As discussed above, the Bronx Property does not produce any rental income and the Westerlo Property has lost money for the past four years and continues to lose money post-petition. Bottom line is that the Debtor barely has sufficient cash flow to meet its monthly expenses, let alone service over $3 million in defaulted secured debt.[3]

38.     The monthly operating reports show that the Debtor has only two paid full time employees: a pastor, associate pastor, and one part-time employee:  the pastor's spouse.  Their salaries and expense allowances comprise more than 50% of Debtor's monthly expenses as reported in its recent monthly operating reports.

39.     With respect to other creditors, the Debtor has listed only a handful of unsecured creditors owed marginal amounts for around 30-days of service — aggregating

---

[3]    The principal source of the Debtor's income appears to be from the Bronx parishioners' tithes and offerings

less than $64,000. These claims are dwarfed in comparison to GoldStar's $3 million Secured Claim.

40.    Next, the Properties are subject to GoldStar's now completed foreclosure action. The timing of Debtor's filing, three days before the foreclosure sale was scheduled to occur, smacks of bad faith; the sole purpose of which was to prevent the sale from occurring.

41.    Further, the Debtor's financial problems "involve largely a dispute between the debtor and the secured creditor which can be resolved in a pending state court action." As noted above, Debtor's dispute lies with one creditor holding 98% of the claims in this case; which obtained a judgment in foreclosure, after nearly five years of litigation and was about to sell its collateral pursuant to a properly noticed foreclosure sale.

42.    Here, there can be no doubt that the Debtor is abusing the purpose of the bankruptcy reorganization solely to prevent its secured creditor from exercising its bargained-for right to foreclose and sell its collateral. Courts routinely dismiss single asset cases filed under these very circumstances. *See, e.g., In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001) (dismissing case as bad faith filing because the sole purpose of the filing was to block mortgagee from exercising legitimate legal remedies); *In re SB Props*, 185 B.R. 198, 205 (Bankr. E.D. Pa. 1995) (dismissing single asset bankruptcy case in part because it was nothing more than a "thinly veiled litigation tactic in a two party . . . dispute"); *In re Trident Assoc. Ltd. Partn.*, 52 F.3d 132 (6th Cir. 1995) (dismissing single asset real estate case in which the debtor had no equity in property subject to foreclosure action and no possibility of reorganization). This matter can, and should, be resolved in the pending state court action. In fact, this matter likely would have been resolved far sooner

had Debtor not filed its chapter 11 petition on the eve of the foreclosure sale of the Properties.

43.    When it becomes apparent that chapter 11 reorganization is highly unlikely, the case should be dismissed. *See In re Lakewood Partners*, 1994 Bankr. LEXIS 1291, at *14. Moreover, even in the unlikely event that Debtor is able to propose a workable plan, its "[p]rospects of a successful reorganization cannot transform a filing . . . otherwise in bad faith under the factors." *In re Carco P'ship*, 113 B.R. 735, 741 (Bankr. M.D. Fla. 1999).

44.    For all of the reasons set forth above, the Debtor's chapter 11 case should be dismissed for cause pursuant to 11 U.S.C. § 1112(b).

**B.    *In the Alternative, the Court Should Modify the Automatic Stay to Permit GoldStar to Exercise Its Secured Creditor Rights***

45.    In the alternative, GoldStar requests entry of an order pursuant to section 362(d) of the Bankruptcy Code authorizing GoldStar to exercise its rights and remedies with respect to the Properties pursuant to the Trust Indenture. Despite voluntarily standing down for the first seven months of this case to give the Debtor an opportunity to propose a viable solution for repaying GoldStar's Secured Claim in a reasonable time frame, the Debtor has failed to propose a viable restructuring plan acceptable to GoldStar.

46.    Section 362(d) of the Bankruptcy Code provides in relevant part:

> [T]he court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1)    for cause, including the lack of adequate protection of an interest in property of such part in interest;
>
> (2)    with respect to a stay of an act against property under subsection (a) of this section, if--
>
>     (A)    the debtor does not have equity in such property; and

(B)     such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(1) and (2).

47.     Sections 362(d)(1) and (2) are disjunctive:  the Court must lift the stay if the movant prevails under either of the two grounds.  The decision of whether to lift the stay is committed to the discretion of the bankruptcy judge.  The burden of proof on a motions to lift the automatic stay is a shifting one, requiring an initial showing by movant under section 362(d)(1), while section 362(g) places the burden of proof on the debtor for all issues other than the debtor's equity in property.  *Kaplan Breslaw Ash, LLC*, 264 B.R. at 336 (granting stay relief where debtor had only one asset, no employees, no discernible cash flow, very few non-insiders unsecured creditors, and none that would be helped by a chapter 11 reorganization and the asset was the subject of a foreclosure action as the result of arrearages on the secured debt, which made the chapter 11 case essentially a two-party dispute between the mortgageholder and the debtor).

> *i.*     ***The Court Should Modify the Automatic Stay for Cause under Section 362(d)(1)***

48.     Under section 362(d)(1), relief from the automatic stay must be granted for cause, including lack of adequate protection and bad faith.  *Kaplan Breslaw Ash,* 264 B.R. at 334; *see also In re MacInnis*, 235 B.R. 255, 259 (S.D.N.Y. 1998) ("Because neither the Code nor the legislative history provides a specific definition of what constitutes 'cause' under § 362(d), courts must determine whether relief is appropriate on a case by case basis, taking into consideration the interests of the debtor, the claimants and the estate.").

49.     Here, although the Debtor is now required to pay $15,000 in monthly adequate protection payments pursuant to a Bankruptcy Court order, that amount is

insufficient to cover the accrued interest at the New York State annual judgment rate of 9%, plus legal fees, costs and other expenses under the Trust Indenture, which continue to accrue at a rate of approximately $25,000-$30,000 per month, significantly more than the monthly adequate protection payment.   Consequently, cause due to lack of adequate protection exists warranting stay relief being granted

50.    Moreover, cause for granting GoldStar stay relief also exists for the same reasons outlined above demonstrating why this chapter 11 case should be dismissed as a bad faith filing.[4]  Accordingly, sufficient cause, including lack of adequate protection and bad faith, exists for the Court to grant GoldStar stay relief pursuant to section 362(d)(1) of the Bankruptcy Code.

### ii.    *Alternative, the Court Should Modify the Automatic Stay Pursuant to Section 362(d)(1)*

51.    Under section 362(d)(2), relief from the automatic stay must be granted if Debtor has no equity in the property, and the property is not necessary to an effective reorganization. *See, e.g.*, *In re Zeoli*, 249 B.R. 61, 64 (Bankr. S.D.N.Y. 2000); *In re Diplomat Electronics Corp.*, 82 B.R. 688, 692 (Bankr. S.D.N.Y. 1988).

52.    For purposes of section 362(d)(2), equity is defined as "the difference between the property value and the total amount of liens against it." *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 428 (Bankr. S.D.N.Y. 2010) (citations omitted); *see also In re Elmira Litho, Inc.*, 174 B.R. 892, 901 (Bankr. S.D.N.Y. 1994) (defining equity as "the difference between the value of the property and the total amount of claims that it secures").

---

[4]    See *MacInnis*, 235 B.R. at 261 (internal quotations omitted)("the standard for determining bad faith is the same" for both relief of stay and dismissal motions); *see also Pickering v. M & T Mortg. Corp.*, 2006 U.S. Dist. LEXIS 58583, *14-16 (S.D.N.Y. Aug. 14, 2006) (same).

53.    In this case, while Debtor originally maintained a modest equity cushion in the Properties, that equity cushion has now significantly diminished due to the Debtor's failure to make any payments under the Bond for nearly five (5) years.  Further, the Debtor's $15,000 monthly adequate protection payment is insufficient to even maintain the *status quo*.  The monthly payment would need to be double or approximately $25,000 to $30,000 per month in order to reduce a continuing diminution in any remaining equity cushion the Debtor may have in the Properties.  Consequently, the Debtor's remaining marginal equity cushion, to the extent it even exists, continues to decrease each day the automatic stay remains in place.

54.    Further, after taking into account the cost of sale, including brokerage commissions, and the additional 12-to-24 months needed to properly market the Properties for sale, it is evident that any marginal equity cushion the Debtor may have based on the Properties' appraised values will have disappeared by the time the sales are completed. Thus, the Debtor effectually has no or nominal equity in the Properties.

55.    With respect to the second required prong under section 362(d)(2), as explained above, there is no realistic prospect of reorganization without the sale of the Properties. *See, e.g.*, *In re Kent Terminal Corp.*, 166 B.R. 555, 567 (Bankr. S.D.N.Y. 1994) (granting motion for relief from automatic stay where any conceivable plan of reorganization would be "patently unconfirmable").

56.    In *In re Mount Moriah Baptist Church, Inc.*, *slip op.* at 8-9, Case No. 10-11199 (SCC) (Bankr. S.D.N.Y. May 12, 2010), this Court granted a mortgagee relief from the automatic stay pursuant to Bankruptcy Code §362(d)(2) to proceed to foreclose on the debtor's church property when the debtor had no equity in the property and had failed to

19

demonstrate that the property was "essential for an effective reorganization that is in prospect." Here, as in *Mount Moriah Baptist Church,* there is no effective reorganization in prospect.

57.    The Westerlo Property, a mountain retreat which is barely utilized and loses money year-after-year, clearly is not needed for a successful reorganization. Westerlo Property is unnecessary drain on the Debtor's financial resources and is not a central nor core function of the organization. To be sure, the Debtor and its pastor would prefer to keep the Westerlo Property so that it can be used as a periodic retreat center, but the Debtor, which is barely breaking even on a cash flow basis, simply cannot afford this luxury retreat property.

58.    With respect to the Bronx Property, while its use is obviously more core to the operations of the church, it is not essential. There is no reason why the Debtor cannot lease an alternative space for use by its congregation at a significantly lower month rent than the current payment obligations on GoldStar's Secured Claim. This solution would allow GoldStar to exercise its secured creditor rights against its collateral, while at the same time permit the Debtor to continue operate its church at a different location in the Bronx at a significantly reduced cost.

## NOTICE

59.    Notice of this Motion has been provided to (i) the Debtor, (i) the office of the United States Trustee, and (ii) Debtor's other creditors.

## NO PRIOR REQUEST

60.    No prior request for the relief sought in the Motion has been made to this Court.

## CONCLUSION

For the foregoing reasons, GoldStar respectfully requests that this Court (i) enter an order, substantially in the form annexed hereto as **Exhibit "2"** either (a) dismissing this chapter 11 case, or (b) in the alternative, granting GoldStar relief from the automatic stay so that it can exercise its rights against its collateral, and (ii) grant such other relief as the Court deems just and proper.

Dated:   July 12, 2016
         New York, New York

                              **HAHN & HESSEN LLP**

                              */s/ Mark T. Power*
                              Mark T. Power, Esq.

                              488 Madison Avenue, 15th Floor
                              New York, New York 10022
                              (212) 478-7200 – Telephone
                              (212) 478-7400 – Facsimile

                              *Counsel for Movant GoldStar Trust Company*